#400

NIQA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | | |
|---|---|---|
| RC OPERATOR, LLC, | ) | |
| *Plaintiff*, | ) | |
| vs. | ) | Case No. 19 3964 |
| JONATHAN BLEIER, and | ) | |
| WT OPERATING, LLC, | ) | |
| *Defendant*. | ) | |

**COMPLAINT**

The Plaintiff RC Operator, LLC, by and through its undersigned counsel, and pursuant to Rule 8 and 10 of the Federal Rules of Civil Procedure, submit its Complaint against Defendants Jonathan Bleier and WT Operating, LLC, and alleges as follows:

**PARTIES**

1. RC Operator, LLC is a Delaware limited liability company with its principal place of business located at 1859 54th Street, Brooklyn, New York. Its sole member is Joseph Schwartz, a natural person and citizen of New York with a principal address of 1859 54th Street, Brooklyn, New York.

2. Defendant Jonathan Bleier ("Bleier") is a natural person and citizen of New Jersey with a principal address of 1470 Parkside Drive, Lakewood, New Jersey.

3. Defendant WT Operating, LLC is a Pennsylvania limited liability company with

its principal place of business located at 1 Penn Boulevard, Philadelphia, Pennsylvania. Upon information and belief, its sole member is Jonathan Bleier, a natural person and citizen of New Jersey with a principal address of 1470 Parkside Drive, Lakewood, New Jersey.

## JURISDICTION AND VENUE

4. There is complete diversity between the parties pursuant to 28 U.S.C. § 1332 because Plaintiff's member is a citizen of New York, and Defendant Bleier is a citizen of New Jersey and Defendant WT Operating, LLC's member is also a citizen of New Jersey.

5. As set forth below and incorporated herein, the amount in controversy requirements of 28 U.S.C. § 1332 are satisfied in that there is more than $ 75,000.00 at issue, exclusive of costs and interest.

6. This action properly lies in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(a), because facts giving rise to this action occurred within this District.

7. Venue is appropriate in this Court because Defendants have engaged in continuous and systemic business activities within the Eastern District of Pennsylvania.

## BACKGROUND

8. Plaintiffs incorporate by reference paragraphs 1 through 7.

9. On or about May 1, 2018 and in anticipation of the formal operational transfer, WT Operating, LLC took over management of the skilled nursing facility commonly known as Willow Terrace.

10. On May 7, 2018, an Operations Transfer Agreement ("OTA") was executed between RC Operator, LLC and WT Operating, LLC. **See Attached Exhibit A**.

11. On or about May 7, 2018, the requirements of section 1 of the OTA were satisfied and WT Operating, LLC formally took over operations of the facility.

12. In exchange for the benefits provided by RC Operator, LLC, and pursuant to the OTA, WT Operating, LLC agreed to be bound by a number of obligations, including, but not limited to, section 9 of the OTA which provides that "[a]ll unpaid Accounts Receivable of Old Operator with respect to periods prior to the Closing that are received by New Operator shall be remitted to Old Operator within thirty (30) days."

13. At all times, RC Operator, LLC was in full compliance with its obligations under the OTA.

14. Upon information and belief, WT Operating, LLC collected Accounts Receivable at least $ 3.5 million which, pursuant to the OTA, was to be paid to RC Operator, LLC.

15. Despite collecting an amount exceeding $ 3.5 million, WT Operating, LLC has only made payment in an amount of $ 400,000 to RC Operator, LLC.

16. As additional consideration, Bleier agreed to pay RC Operator, LLC forty percent (40%) of WT Operating, LLC's net income from the date of closing and each year going forward.

17. Upon information and belief, RC Operator, LLC is due at least $ 3.1 million from WT Operating, LLC for unpaid Accounts Receivable as well as forty percent (40%) of WT Operating, LLC's net income from Bleier.

18. Despite making demands for payment of same, RC Operator, LLC has yet to receive full payment from WT Operating, LLC and Bleier.

**COUNT I**
**BREACH OF CONTRACT - OTA**

19. Plaintiffs incorporate by reference paragraphs 1 through 18.

20. RC Operator, LLC and WT Operating, LLC entered into an agreement for the operational transfer of the skilled nursing facility commonly known as Willow Terrace for which WT Operating, LLC was required to pay over all accounts receivable with respect to periods prior to closing. **See Exhibit A**.

21. RC Operator, LLC fully performed all of its obligations under the agreement.

22. WT Operating, LLC failed to perform its following obligations under the agreement: (i) full payment to RC Operator, LLC; and (ii) permitting RC Operator, LLC, or its representatives, from reviewing its books and records to determine the accurate sum due to them under section 9 of the OTA.

23. As a result of WT Operating, LLC's failure to perform its obligations under the agreement, RC Operator, LLC suffered damages in an amount exceeding $ 75,000.00.

**COUNT II**
**ACCOUNTING**

24. Plaintiffs incorporate by reference paragraphs 1 through 23.

25. Section 11 of the OTA requires that WT Operating, LLC provide RC Operator, LLC access to its books and records to determine accounts receivable collections due to RC Operator, LLC.

26. Section 11(b) of the OTAs state that:

> Subsequent to the Closing Date, New Operator shall allow Old Operator and its Representatives to have reasonable access to

> (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns and to verify accounts receivable collections due Old Operator.

27. Despite several requests, WT Operating, LLC has refused to provide access to its books and records.

28. RC Operator, LLC fully performed all of its obligations under the OTA.

29. Despite RC Operator, LLC's compliance and full performance, WT Operating, LLC failed to transfer Accounts Receivable that it collected and, by virtue of the OTA, is due to RC Operator, LLC.

30. Upon information and belief, WT Operating, LLC withheld or wrongfully offset funds due to RC Operator, LLC.

31. Despite RC Operator, LLC's demands and prior requests, WT Operating, LLC failed to provide RC Operator, LLC access to the books and records.

32. Accordingly, RC Operator, LLC requests an order from this Court requiring WT Operating, LLC provide access to its books and records.

33. RC Operator, LLC is prepared to retain a forensic account to conduct this accounting.

**COUNT III**
**BREACH OF CONTRACT - BLEIER**

34. Plaintiffs incorporate by reference paragraphs 1 through 33.

35. As additional consideration for the operational transfer of Willow Terrace from RC Operator, LLC to WT Operating, LLC, Bleier agreed to make payment to RC Operator, LLC in an amount equal to forty percent (40%) of his net income from WT Operating, LLC.

36. RC Operator, LLC fully performed its entire obligation under this agreement, as well as the OTA.

37. Bleier failed to perform his obligation under this agreement to make payment to RC Operating, LLC.

38. As a result of Bleier's failure to perform his obligation under the agreement, RC Operator, LLC suffered damages in an amount exceeding $ 75,000.00.

WHEREFORE, Plaintiffs respectfully request that this Court:

i. Enter judgment on Plaintiff's behalf on each of the counts in Plaintiff's Complaint;

ii. Award Plaintiff its costs and attorney fees; and

iii. Grant Plaintiff such other relief as the Court deems just and proper.

Respectfully submitted,

**GREEN & SCHAFLE LLC**

Date: August 29, 2019

By: ______________________

Adam M. Green, Esquire
Michael C. Schafle, Esquire
100 South Broad Street, Suite 1218
Philadelphia, PA 19110
Tel: (215) 462-3330
Fax: (215) 567-1941
Email: mschafle@greenlegalteam.com

agreen@greenlegalteam.com

**ROBERT J. FEDOR, ESQ., LLC**
Robert J. Fedor (OH #0042653)
*Pro Hac Vice Admission Pending*
23550 Center Ridge Road, Suite 107
Westlake, Ohio 44145
(440) 250-9709
Fax: (440) 250-9714
rjfedor@fedortax.com
*Attorneys for Plaintiff*

***EXHIBIT "A"***

---

**OPERATIONS TRANSFER AGREEMENT**

by and between

RC Operator, LLC,
a Delaware limited liability company,

"Old Operator"

and,

WT Operating, LLC
a Pennsylvania limited liability company,

"New Operator"

Dated as of: May, 7, 2018

---



**EXHIBIT A**

TABLE OF CONTENTS


| SECTION | | PAGE |
|---|---|---|
| 1. | CLOSING. | 1 |
| 2. | CONDITIONS PRECEDENT | 1 |
| 3. | LIABILITIES OF OLD OPERATOR | 4 |
| 4. | CONVEYANCE OF PERSONAL PROPERTY | 6 |
| 5. | TRANSFER OF PATIENT TRUST FUNDS | 7 |
| 6. | COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES | 5 |
| 7. | CONTRACTS | 8 |
| 8. | ACCOUNTS RECEIVABLE; ACCOUNTS PAYABLE | 8 |
| 9. | EMPLOYEES | 8 |
| 10. | EMPLOYMENT RECORDS | 8 |
| 11. | ACCESS TO RECORDS | 9 |
| 12. | USE OF TELEPHONE NUMBER | 9 |
| 13. | PROVIDER AGREEMENTS | 9 |
| 14. | COOPERATION; INTERIM OPERATION OF THE FACILITY | 10 |
| 15. | INDEMNIFICATION | 11 |
| 16. | REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR | 12 |
| 17. | REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR | 13 |
| 18. | NO JOINT VENTURE | 15 |
| 19. | EXHIBITS AND SCHEDULES | 15 |
| 20. | EVENTS OF DEFAULT; REMEDIES | 22 |
| 21. | CHOICE OF LAW | 22 |
| 22. | DISPUTE RESOLUTION | 22 |
| 23. | JURISDICTION; VENUE | 19 |
| 24. | ATTORNEYS FEES IN THE EVENT OF DISPUTE | 24 |
| 25. | DEFINITIONS | 20 |
| 26. | GENERAL PROVISIONS | 24 |




EXHIBIT A

# OPERATIONS TRANSFER AGREEMENT

This **OPERATIONS TRANSFER AGREEMENT** (this "Agreement") is entered into this 7th day of May, 2018 (the "Effective Date") by and between RC Operator, LLC, a Delaware limited liability company ("Old Operator") and WT Operating, LLC, a Pennsylvania limited liability company ("New Operator").

WITNESSETH:

**WHEREAS**, Albert Einstein Medical Center, a Pennsylvania non-profit corporation (the "Landlord") currently owns that certain real property improved with that certain 174 bed skilled nursing facility commonly known as Willow Terrace located at One Penn Boulevard, Philadelphia, PA 19144 (the "Facility"); and certain other property located therein (collectively with the Facility, the "Property");

**WHEREAS**, Old Operator is currently party to a lease agreement (the "Lease") with Landlord, with respect to the Facility and the Property;

**WHEREAS**, as part of the transactions set forth herein, the Lease will be terminated and New Operator shall enter into a new lease with Landlord (the "New Lease"), and following the Closing shall operate the Facility and Property pursuant thereto;

**WHEREAS**, as part of the transactions set forth herein and in consideration thereof, New Operator is also assuming any liabilities of Old Operator with respect to Medicare payments received by Old Operator in connection with the Facility, prior to the Closing;

**WHEREAS**, at the closing of the transactions contemplated under the New Lease, and in furtherance of a desire by the parties hereto to ensure a smooth transition of operations of the Facility, the parties hereto desire to enter into this Agreement.

**NOW, THEREFORE**, for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged by the parties hereto, the parties hereto agree as follows:

**1. CLOSING**. The closing of the transactions contemplated hereby (the "Closing") shall take place at such time as New Operator's licensure from DOH is effective, subject to the satisfaction or waiver of each of the closing conditions set forth in Section 2 hereof (other than those conditions which can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall be effective as of 12:01 a.m. (Central Time) on the Closing Date (the "Effective Time").

**2. CONDITIONS PRECEDENT**. New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction of New Operator or the waiver thereof by New Operator of the following conditions precedent on or prior to the Closing Date, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a. Old Operator shall have duly and timely performed and fulfilled in all

respects all of its duties, obligations, promises, covenants and agreements hereunder;

b. Each of the representations and warranties of Old Operator contained in this Agreement shall have been true, correct complete and not misleading in all respects as of the Effective Date and as of the Closing Date;

c. Old Operator shall have delivered to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator:

1. a bill of sale, in substantially the form annexed hereto as **Exhibit A** (the "Bill of Sale"), containing a warranty of title, duly executed and acknowledged by Old Operator, sufficient to convey to New Operator good and indefeasible title, free of all Liens, in and to the personal properties included in the Transferred Assets;

2. an assignment by Old Operator, in substantially the form annexed hereto as **Exhibit B** (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

i. the Assumed Contracts (as defined herein);

ii. the Patient Trust Funds and Property (as defined herein);

iii. the Provider Agreements (as defined herein);

iv. the Resident Agreements (as defined herein); and

v. the Website Material (as defined herein).

3. a duly executed certificate of an authorized officer of Old Operator or its managing constituent, dated as of the Closing Date, to the effect and stating that (A) this Agreement and the Other Documents to which Old Operator is a party have been duly authorized, executed and delivered by Old Operator pursuant to all necessary resolutions or consents of the appropriate governing body of Old Operator, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents to which Old Operator is a party on behalf of Old Operator, (B) the executing persons are fully authorized to act on behalf of Old Operator or its constituent partners or members, as applicable and (C) conditions specified in Section 2(a), Section 2(b), Section 2(e), Section 2(f), Section 2(g), Section 2(h), Section 2(i) and Section 2(l) have been satisfied;

4. all Permits, if any, issued by any Governmental Authority relating to the operating of the Facility by Old Operator running to, or in favor of, Old Operator, to the extent legally assignable; and

5. counterparts to the Other Documents duly executed by all parties thereto (other than New Operator);

d. There shall not have been imposed against Old Operator, nor shall have Old Operator received notice of: (a) any civil monetary penalty ("CMP") or other federal, state or local fine and/or penalty ("Penalty"), (b) Recaptured Claim, or (c) any survey deficiency of the severity level of "D" or worse.

e. Old Operator shall have transferred to New Operator the Patient Trust Funds and Property in compliance with all Applicable Laws with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of Section 5 below;

f. Between the Effective Date and the Closing Date, there shall not have been any material adverse change in the regulatory status and/or condition of any of Old Operator's Permits, and the Medicare and Medicaid rates of the Facility;

g. Between the Effective Date and the Closing Date, there shall not have been any material adverse change to the business operations, financial condition or prospects of the Facility;

h. On the Closing Date, there shall not be any lawsuits filed or threatened against Old Operator or any of its affiliates which New Operator determines could be anticipated to adversely affect the Facility and/or the transaction contemplated hereunder;

i. New Operator shall have received DOH approval of the Licensure and all other Regulatory Approvals required by New Operator in order to operate the Facility in the manner presently operated by Old Operator, subject to conditions acceptable to New Operator in its reasonable discretion, and such approvals shall not have been revoked or modified;

j. New Operator shall have received the duly executed Guaranty (as defined herein);

k. New Operator shall have approved of any updates to the Schedules and/or Exhibits, pursuant to Section 19 hereof; and

l. New Operator shall have received a fully executed termination of the Lease and entered into the New Lease, effective as of the Closing Date.

Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the satisfaction of Old Operator or the waiver thereof by Old Operator of the following conditions precedent on and as of the Closing Date, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a. New Operator shall have duly and timely performed and fulfilled all of its

duties, obligations, promises, covenants and agreements hereunder;

b. Each of the representations and warranties of New Operator contained in this Agreement shall be true, correct, complete and not misleading in all respects as of the Effective Date and the Closing Date; and

c. New Operator shall have executed and delivered to Old Operator the Other Documents to which it is a party.

In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

**3. LIABILITIES OF OLD OPERATOR; ASSUMED LIABILITIES.**

a. Other than as specifically set forth in this Section 3 with respect to the Assumed Liabilities, New Operator shall not be the successor to Old Operator, and Old Operator hereby acknowledges and agrees that pursuant to the terms of this Agreement, neither New Operator nor any of its Affiliates shall assume or become liable to pay, perform or discharge any Liability of Old Operator of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event and whether or not relating to Old Operator any of the Business, regardless of any disclosure made or exceptions noted with respect to the representations and warranties, covenants or agreements contained in this Agreement or any other document executed or delivered by Old Operator in connection with the transactions contemplated hereby, including without limitation the following specifically enumerated Liabilities (collectively, the "Excluded Liabilities"):

i. all Liabilities for Indebtedness of Old Operator;

ii. all Liabilities of Old Operator that relate to any of the Excluded Assets (as defined herein);

iii. all Liabilities of Old Operator or for which Old Operator could be liable relating to Taxes (including with respect to the Facility or otherwise) including any Taxes that will arise as a result of the transfer of any of the Transferred Assets pursuant to this Agreement and any Liability related to Taxes of Old Operator imposed upon New Operator by reason of New Operator's status as transferee of the Business or any of the Transferred Assets (including under any bulk sales law);

iv. all Transaction Expenses of Old Operator in connection with,

resulting from or attributable to the transactions contemplated by this Agreement and the Other Documents;

v. all Liabilities of Old Operator that relate to the Recapture Claims (as defined herein);

vi. any Liability relating to bed taxes and/or similar fees and charges, that are either accrued with respect to periods prior to the Closing or otherwise calculated with reference to periods prior to the Closing;

vii. any Liability arising out of any Action commenced against Old Operator or with respect to the Facility after the Closing, the facts of which arising out of, or relating to, any occurrence, circumstance or event happening or existing prior to the Effective Time;

viii. any Liability of Old Operator relating to any Action for malpractice, professional liability, resident rights violations or violations of employee rights or contracts or otherwise constitute or are alleged to constitute a tort, breach of contract or violation of any law, rule, regulation, treaty or other similar authority;

ix. any Liability under any Assumed Contract which arises after the Closing and relates to any breach or alleged breach that occurred prior to the Closing.

x. any Liability of Old Operator for amounts due or which may become due or owing under any Existing Contracts with respect to the period prior to the Effective Time, whether known or unknown on the Effective Date;

xi. any Liability with respect to the Current Employees (as defined herein) or former employees, or both (or their personal representatives) of Old Operator (including any Liabilities arising under any Benefits Plan of Old Operator, other Liabilities described in Section 9 and Liabilities relating to any employer-paid portion of any employment and payroll Taxes that become payable in connection therewith), except for Liabilities expressly assumed by New Operator under Section 8(c);

xii. any Liability pursuant to the WARN Act relating to any action or inaction of Old Operator on or prior to the Effective Time, including any liabilities under WARN Act as a result of New Operator failing to hire any Employee as of the Closing;

xiii. any Liability under any contract, agreement, lease, mortgage, indenture or other instrument of Old Operator, except for the Assumed Contract;

xiv. any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Old Operator;

xv. any Liability arising out of or resulting from non-compliance with any Applicable Law by Old Operator;

xvi. any Liability of Old Operator under this Agreement or any Other Document; and

xvii. any other Liabilities of Old Operator with respect to any acts, events or transactions whether occurred in the past, occurring at the present or occurring in the future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened.

b. New Operator shall have no duty whatsoever to take any action or receive or make any payment arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Closing, including, but not limited to, any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom.

c. The parties hereto agree and acknowledge that, notwithstanding anything to the contrary in this Agreement, Old Operator shall retain, and New Operator shall not accept, any of Old Operator's rights, title and interest in and to any assets of Old Operator (including any Accounts Receivable of Old Operator) other than the Transferred Assets (collectively, the "Excluded Assets").

d. The parties hereto acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or any Other Document shall not create an Assume Liability or other Liability of New Operator, except where such disclosed obligation has been expressly assumed by New Operator as an Assumed Liability in accordance with the terms of this Agreement.

e. For the avoidance of doubt, nothing contained in this Agreement shall omit any claim or defenses New Operator may have against any Third Party. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Old Operator or New Operator as compared to the rights and remedies which such Third Party would have had against Old Operator had New Operator not assumed such Assumed Liabilities.

f. Notwithstanding anything contained herein to the contrary, at the Closing New Operator shall assume all obligations of Old Operator with respect to Medicare overpayments received by Old Operator in connection with the Facility, that are claimed by CMS following the Closing (the "Assumed Liabilities").

**4. CONVEYANCE OF PERSONAL PROPERTY.** On the Closing Date, Old Operator shall transfer to New Operator all food, central supplies, linens and housekeeping supplies, computer hardware and software, vehicles and other consumable and non-consumable inventory maintained with respect to the Facility, as well as any other assets of Old Operator relating to the Facility (the "Personal Property"). Old Operator shall have no obligation to

deliver the Personal Property to any location other than that at which each item of Personal Property is currently located, and New Operator agrees that the presence of the Personal Property at the Facility on the Closing Date shall constitute delivery thereof.

**5. TRANSFER OF PATIENT TRUST FUNDS.**

a. Prior to the Closing, Old Operator shall provide to New Operator a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Old Operator of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as Schedule 5.a. ("Patient Trust Funds and Property").

b. Old Operator will indemnify, defend and hold New Operator harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees: i) in the event the amount of funds or any property, if any, transferred to New Operator did not represent the full amount of the funds and/or property delivered to Old Operator as of the Closing Date, ii) with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or iii) for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds and Property prior to the Closing Date.

c. New Operator will indemnify, defend and hold Old Operator harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator with respect to the Patient Trust Funds and Property where said funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator after the Closing Date with respect to Patient Trust Funds and Property actually received by New Operator.

**6. COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.**

a. Old Operator shall timely prepare and file with the appropriate Medicare and Medicaid agencies its final cost reports in respect to its operation of the Facility as soon as practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by Applicable Law for the filing of each such final cost report under the applicable third-party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Old Operator's failure to timely file such final cost reports.

b. Each party hereto agrees to notify the other within five (5) Business Days after receipt of any notice of any claim, audits, assessment inquires, proceedings, disputes, examinations, determination or denials or similar events by DOH, CMS, OIG or any other Governmental Authority with respect to any of the following, relating to periods prior to the Effective Time: (i) an alleged Medicare or Medicaid overpayment, or

any other recoupment or adjustment to reimbursement, (ii) an alleged underpayment of any Tax or assessment or iii) any other governmental or third-party payor claims (each, a "Recapture Claim"). For avoidance of doubt, the failure to provide notification of a Recapture Claim within the foregoing timeframe shall in no way effect a party's rights to indemnification with respect thereto.

c. In the event DOH, CMS, OIG, any other Governmental Authority making payments to New Operator for services performed at the Facility after the Closing or any other third-party payor makes any Recapture Claim, then other than with respect to the Assumed Liabilities Old Operator hereby agrees to save, indemnify, defend and hold New Operator harmless from and against any Loss incurred or suffered by New Operator relating to, arising from, by reason of or in connection with any such claim. In connection with the foregoing indemnification obligation, in the event that DOH, CMS, OIG or any other Governmental Authority or other third-party payor source withholds amounts from New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to New Operator within three (3) Business Days following New Operator's demand therefor. In the event Old Operator fails to pursue any issue or issues relating to appeal of a Recapture Claim, New Operator may, at Old Operator's expense, pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.

d. Old Operator shall pay, prior to the Closing, all outstanding Recapture Claims and any other fees and taxes due with respect to the Facility for periods prior to the Closing, and shall provide to New Operator, on or before the Closing, evidence reasonably satisfactory to New Operator of the foregoing payments. Old Operator shall also remain liable and responsible for the correction of all violations cited by DOH or any other Governmental Authority in any survey prior to or after the Closing, that result from a condition that existed at the Facility prior to the Closing Date or as a result of an action or inaction of Old Operator prior to the Closing Date.

e. Old Operator shall deliver to New Operator copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date, for New Operator's review, at least ten (10) days prior to filing of such reports, and provide New Operator with reasonable access to the underlying documentation for such reports.

7. **CONTRACTS.**

a. As soon as practicable after the date hereof, the Old Operator shall deliver to the New Operator true, accurate and complete copies of all Existing Contracts, a schedule of which is attached hereto as Schedule 7.a. In accordance with the terms of the General Assignment and this Agreement, Old Operator shall assign and transfer to New Operator all of Old Operator's rights, title and interest in, to and under the Existing Contracts chosen by New Operator in its sole discretion and set forth in Schedule 7.b. hereto (collectively, the "Assumed Contracts," and the Exiting Contracts not assigned to New Operator shall hereinafter be referred to as the "Rejected Contracts"), and New Operator shall assume all of the Liabilities of Old Operator under the Assumed Contracts

that accrue after the Effective Time and that do not arise from occurrences, circumstances or events occurring or existing , or breaches existing at or prior to the Effective Time (it being understood that any interest, penalty or other amounts required to be paid under any Assume Contract as a result of any non-payment or other breach by Old Operator thereunder shall not be an Assumed Liability). In particular and without limiting the generality of the foregoing, New Operator does not assume any collective bargaining agreements of Old Operator, and New Operator does not otherwise assume any obligations relating thereto.

b. To the extent any third party consent is required in connection with the assignment and assumption of the Assumed Contracts, Old Operator hereby covenants and agrees to use its best efforts to obtain such third party consent prior to the Closing Date. To the extent Old Operator shall be unable to obtain such third party consent, Old Operator and New Operator shall cooperate and take such steps as may be necessary in order for New Operator to receive the benefits under such Assumed Contracts, provided that New Operator agrees to fulfill any obligations of Old Operator that shall arise with respect to such Assumed Contracts on and after the Closing Date.

c. Old Operator shall also transfer, convey and assign to New Operator on the Closing Date all customer lists, prospect lists, and existing agreements with residents and any guarantors thereof (the "Resident Agreements"), to the extent assignable by Old Operator.

**8. EMPLOYEES.**

a. Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which is attached hereto as Schedule 8.a. (such listing, to include the current base salaries of all such employees) (the "Current Employees"), as of the Closing Date. New Operator shall not be bound by or assume any employment contracts to which Old Operator may be a party. Other than consistent with past practice, Old Operator shall not make any material changes in the compensation or benefits of the employees at the Facility prior to the Closing Date.

b. New Operator shall determine, in its sole discretion, which of the Current Employees shall be offered employment with New Operator, pursuant to employment terms acceptable to New Operator (hereinafter, the "Retained Employees"). Nothing in this paragraph, however, shall create any right in favor of any person not a party hereto, including without limitation, the Current Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate of Old Operator who is a Current Employee.

c. On the Closing Date, Old Operator shall provide New Operator with a payment of an amount equal to all of the accrued (whether vested, unvested, contingent or mature) paid time off (which shall include all days for which Retained Employees are paid but do not actually work, such as sick days, vacation days, and holidays) and all other accrued but unpaid payroll obligations including but not limited to all FICA, withholding, unemployment, workmen's compensation, union dues or other employment

related taxes in connection with the foregoing ("Old Operator's Employment Expenses"). New Operator expressly acknowledges that New Operator shall assume all obligations related to Old Operator's Employment Expenses. A schedule of Old Operator's Employment Expenses is attached hereto as Schedule 8(c), and shall be updated prior to the Closing to reflect amounts outstanding at the Closing. In the event that New Operator discovers after the Closing Date that the amount credited is less than the amounts required under this Section 8(c), Old Operator shall pay to New Operator, within ten (10) days after New Operator provides notice thereof, an amount equal to such deficiencies.

**9. ACCOUNTS RECEIVABLE.**

a. All unpaid Accounts Receivable of Old Operator with respect to periods prior to the Closing that are received by New Operator shall be remitted to Old Operator within thirty (30) days.

b. All Accounts Receivable of New Operator with respect to periods following the Closing shall be the sole property of New Operator.

c. If at any time after the Closing Date, Old Operator shall receive any payment with respect to services rendered at the Facility, then Old Operator shall remit such payments to New Operator to be allocated in accordance with the foregoing provisions of this Section 9. Any such remittances pursuant to this Section 9.c. shall occur within three (3) Business Days from the date the party required to make such remittance receives payment thereof.

d. For avoidance of doubt and notwithstanding anything contained herein to the contrary, any bed tax revenues received following the Closing shall be the sole property of New Operator and Old Operator shall have no rights with respect to such payments.

e. Any non-designated payments received by New Operator or Old Operator shall first be applied to any post-Closing balances due to New Operator for services provided following the Closing (with the excess, if any, applied to any pre-Closing balances due for services rendered by Old Operator prior to the Closing).

**10. EMPLOYMENT RECORDS.** Old Operator shall deliver to New Operator, prior to the Closing Date, either the originals or full and complete copies of all employee records for all Retained Employees in its possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "Employee Records"). Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the Closing Date.

**11. ACCESS TO RECORDS.**

a. On the Closing Date, Old Operator shall deliver to New Operator all of the Books and Records of the Facility, including patient medical and financial records,

provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations; and provided, further, that Old Operator shall give New Operator access to any information in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

b. Subsequent to the Closing Date, New Operator shall allow Old Operator and its Representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns and to verify Accounts Receivable collections due Old Operator.

c. Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation. Any record so removed shall promptly be returned to New Operator following its use.

d. New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including patient records and records of patient funds, to the extent required by law, but in no event less than three (3) years.

**12. USE OF TELEPHONE NUMBER AND WEBSITE; POLICY AND PROCEDURE MANUALS.**

a. New Operator may use the present telephone numbers as well as any websites or internet domain names ("Website Materials") of the Facility. Old Operator shall as of the Closing Date transfer or cause to be transferred, at its expense, the telephone numbers used by the Facility.

b. Old Operator agrees to leave its policy and procedure manuals at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator under the Bill of Sale referenced in Section 2 of this Agreement.

**13. PROVIDER AGREEMENTS.** For any periods following the Closing that New Operator is not yet able to bill under its Medicaid, Medicare, Managed Care and any other third-party provider agreements (the "Provider Agreements"), Old Operator shall allow New Operator to bill under Old Operator's Provider Agreements, to the extent permitted by applicable law, and Old Operator shall promptly forward to New Operator any payments received with respect

thereto within three (3) Business Days of receipt thereof. At the Closing, a designee of New Operator shall be granted signature and wire transfer authority over bank accounts of Old Operator, for the purpose of properly directing remittance to New Operator of payments received with respect to post-Closing billings made pursuant to this Section 13.

**14. COOPERATION; INTERIM OPERATIONS OF THE FACILITY.** Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to effect an orderly transfer of the operation of the Facility. Old Operator shall fully cooperate with New Operator in connection with submitting an application to DOH with respect to the Licensure, as well as any applications with respect to the Provider Agreements, and shall also fully cooperate with regard to any additional actions or information required with respect to approval of the Licensure and/or New Operator's Provider Agreements, or otherwise requested in connection with the transactions contemplated herein.

From the date of this Agreement until the Closing, Old Operator shall operate the Facility in substantially the same manner as it has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with Third Parties and use best efforts to keep available the services of all of the Facility's employees. Without limiting the generality of the preceding sentences, until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, Old Operator shall:

a. operate the Facility in the normal course of business and in compliance with all laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

b. provide New Operator with a written weekly status report, setting forth the current census, new admissions with payor source, and any significant financial or operational developments.

c. maintain the Facility's licensure status in substantial compliance with all applicable laws, rules and regulations;

d. not sell, transfer or otherwise dispose of any of the Personal Property except in the Ordinary Course of Business consistent with the prior practices of Old Operator, in which event Old Operator shall replace the same with similar property of equal quality, value and usefulness;

e. not enter into any contract which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any Contract which exists at present without New Operator's prior written consent;

f. not decrease the private pay rates of the residents of the Facility without the prior written consent of New Operator;

g. maintain records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be

current, complete, accurate and true;

h. not increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any of the employees of the Facility without the prior written consent of New Operator;

i. not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated;

j. perform all of its obligations in respect of the Facility whether pursuant to any contracts, or other requirements, including payment before the same shall become due of all taxes, duties and other governmental charges that accrue prior to the Closing Date;

k. not transfer residents from the Facility to any other skilled nursing facility, other than as requested by such resident or as required for the care of such resident; and

l. promptly inform New Operator in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against.

New Operator and Old Operator agree and acknowledge that the employees at the Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as certified operator of the Facility is based upon the skills and qualifications of such employees. As such, in the event that during the period beginning on the Effective Date and ending upon the date that is two (2) years following Closing, any Current Employee is hired for employment by any person or entity that either directly or indirectly controls, is under common control with or is otherwise affiliated with Old Operator, then Old Operator shall pay to New Operator an amount equal to Fifty Thousand Dollars ($50,000.00) as liquidated damages, for each such Current Employee. The parties agree and acknowledge that actual damages with respect to the foregoing would be difficult to ascertain and that Fifty Thousand Dollars ($50,000.00) is a fair and reasonable approximation of such actual damages.

**15. INDEMNIFICATION.**

a. By Old Operator. In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Old Operator shall indemnify, save, protect, defend and hold harmless, New Operator, its Affiliates, and their respective members, managers, employees, shareholders, officers, directors and agents (collectively, the "New Operator Indemnitees"), from and against any and all Losses incurred or suffered by any such New Operator Indemnitee arising from, by reason of or, in connection with (i) any misrepresentation or inaccuracy in, or breach of any representation or warranty of Old Operator contained in this Agreement or any certificate delivered pursuant hereto on the part of Old Operator, (ii) any breach by Old Operator of any covenant or agreement made by Old Operator in this Agreement (including under this Section 15), (iii) conduct of the Business or other operation of the



EXHIBIT A

Facility prior to the Effective Time, (iv) any fraud or intentional misrepresentation on the part of any Old Operator or its Representatives, (v) any Recapture Claim (other than with respect to the Assumed Liabilities), (vi) any resident admitted by Old Operator prior to the Closing, that is not determined to be eligible for Medicaid reimbursement following the Closing (and for whom another payor source is not available), or (vii) the Excluded Liabilities.

b. By New Operator. In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, New Operator shall indemnify, save, protect, defend and hold harmless Old Operator, their employees, members, managers, shareholders, officers, directors and agents (collectively, the "Old Operator Indemnitees"), from and against any and all applicable Losses incurred or suffered by any such Old Operator Indemnitee arising from, by reason of or, in connection with (i) any breach by New Operator of its obligations, representations, warranties, agreements or covenants hereunder, and (ii) New Operator's operation of the Facility following the Effective Time.

c. In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement is made against or received by any indemnified party (hereinafter "Indemnitee") hereunder or upon an Indemnitee becoming aware of a fact, condition or event that otherwise constitutes a basis for a claim for indemnification against the Indemnitor (an "Indemnitee's Claim"), said Indemnitee shall notify the indemnifying party (hereinafter "Indemnitor") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity obligations hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend or indemnify the Indemnitee's Claim. Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent. Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder. In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim (or in the event sufficient funds are not available for such indemnification) and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim,

on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

d. For avoidance of doubt, Old Operator has agreed that New Operator's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by New Operator.

e. The obligations of Old Operator hereunder shall be fully guaranteed by Wyndmoor Care Center, LLC, a Delaware limited liability company, Carrington Place of Chestnut Hill, LLC, a Virginia limited liability company, and Chestnut Hill HCP I, LL, a Virginia limited liability company, pursuant to a guaranty agreement to be provided prior to the Closing (the "Guaranty")

f. The parties' obligations under this Section 15 shall survive the Closing.

**16. REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR.** As an inducement to Old Operator to enter into this Agreement, New Operator covenants and makes the following representations and warranties set forth below, which are true and correct as of the date hereof and which shall be true and correct on the Closing Date:

a. Organization and Authority. New Operator is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and as of the Closing Date will have, all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so. This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

b. No Violations. Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by New Operator will:

i. violate any provision of its Operating Agreement; or

ii. be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

c. No Broker. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of New Operator.

d. Accuracy of Representations and Warranties of New Operator. No representation or warranty by or on behalf of New Operator contained in this Agreement and no statement by or on behalf of New Operator in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Old Operator by or on behalf of New Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

e. Survival of Representations and Warranties of New Operator. Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing.

**17. REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR**. Except as set forth in the Old Operator Disclosure Schedules (it being understood that (i) nothing in Old Operator Disclosure Schedules shall be adequate to disclose an exception to a representation or warranty made in this Section 17, unless such section or subsection of the Old Operator Disclosure Schedules identifies the exception with reasonable particularity, (ii) the mere listing or referencing (or inclusion of a copy) of a document or other item shall not be adequate to disclose an exception to a representation or warranty, unless the representation or warranty has to do with the existence of such document or item and (iii) no exceptions to any representations or warranties disclosed in any specific section or subsection of the Old Operator Disclosure Schedule shall constitute an exception to any other representations or warranties Old Operator in this Section 17), and as an inducement to New Operator to enter into this Agreement, Old Operator covenants and makes the following representations and warranties, which are true and correct as of the date hereof and which shall be true and correct as of the Closing Date:

a. Organization and Authority. Old Operator is a limited liability company that validly exists under the laws of the State of Delaware. Old Operator has full power and right to enter into and perform its obligations under this Agreement and the Other Documents. The execution and delivery of this Agreement and the Other documents to which Old Operator is a party and the consummation of the transactions contemplated hereby and thereby (1) have been duly authorized by all necessary action on the part of Old Operator, (2) do not require any governmental or other consent and (3) will not result in the breach of any agreement, indenture or other instrument to which Old Operator is a party or is otherwise bound.

b. Condition of the Facility and Transferred Assets. There is no defective physical condition with respect to the Facility and Transferred Assets, including without limitation

the building, HVAC, boiler and other applicable systems thereof, as well as all furniture, fixtures and equipment therefo.

c. Environmental Condition. Old Operator has not generated, stored or released any Hazardous Substance on the Property, and there is not currently any Hazardous Substance on the Property.

d. Leases. As of the Closing Date there shall be, no occupancy rights (written or oral), leases or tenancies presently affecting the Property or the Facility and the portion of the Property which it is located, other than any occupancy rights of any residents of the Facility.

e. Permits. The Permits as listed on Schedule 17(e) hereto are all of the material certificates, licenses and permits from governmental authorities held by Old Operator in connection with the ownership, use, occupancy, operation and maintenance of the Facility, and are all of the certificates, licenses, accreditations and permits necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

f. Required Consents. No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Old Operator of this Agreement, or the performance of the transactions contemplated thereunder, except (1) approval by DOH of the Licensure, and (2) such consents, certifications or licenses from the DOH, United States Department of Health and Human Services, CMS or any other governmental agency with jurisdiction over the Facility as are necessary to permit Old Operator to operate the Facility prior to the Closing Date.

g. Sufficiency of Assets. The Transferred Assets constitute all of the assets, tangible and intangible, real and personal of any nature whatsoever, necessary and sufficient for operation of the Facility of 174 skilled nursing dually-certified beds, in compliance with all Applicable Laws and in the manner presently operated by Old Operator. There are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility license. Each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by DOH. For each such bed, there also exists the minimum furnishings, fixtures and other accessories required by DOH.

h. Litigation; Claims. Except as set forth in Schedule 17(h), there are no pending or threatened litigation, investigations, claims, lawsuits, penalties, fines, governmental actions or other proceedings, including without limitation, any desk audit or full audit, involving the Facility, or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator.

i. Compliance with Applicable Laws. Other than as set forth on Schedule 17(i) hereof (which shall include without limitation any open survey deficiencies), the Facility has been and is presently used and operated in compliance with, and in no way violate any Applicable Law of any kind whatsoever affecting the Facility or any part thereof. In

addition, no waivers have been obtained or are required to make the representations contained in this Section 17(i) fully true and correct and not misleading in all respects.

j. Taxes. Old Operator has timely filed all Tax Returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns.

k. Sprinklers. There is a sprinkler system at the Facility that is in full operational compliance with all applicable requirements.

l. Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of Old Operator.

m. No Defaults. The execution, delivery and performance of this Agreement and any of the Other Documents by Old Operator does not and will not:

i. conflict with or result in any breach of the provisions of, or constitute a default under any Old Operator's certificate of formation or operating agreement;

ii. violate any restriction to which Old Operator is subject or, with or without the giving of notice, the passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any mortgage, deed of trust, license, material lease, indenture or other material agreement or instrument, whether oral or written, to which Old Operator or the Facility is a party, or by which it or its property is bound, which will not be satisfied or terminated on or prior to the Closing as a result of the transactions contemplated in this Agreement, or result in the termination of any such instrument or termination of any provisions in such instruments that will have a material adverse effect upon or result in the creation or imposition of any Lien upon the Transferred Assets; or

iii. constitute a violation of any applicable law by which Old Operator or the Facility is subject, the violation of which will have a material adverse effect upon the Facility.

n. Health Care Matters.

i. All material Medicare and Medicaid provider agreements, certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses required by DOH or any other health care authorities for the legal use, occupancy and operation of the Facility (collectively, "Health Care Licenses") have been obtained by the party required to hold such Health Care Licenses and

are in full force and effect. Old Operator will own and operate the Facility in such a manner that the Health Care Licenses shall remain in full force and effect. Set forth on Schedule 17(n) attached hereto is a list of the Facility's Medicare and Medicaid provider numbers and a list of all Health Care Licenses.

ii. The Facility is duly licensed as a skilled nursing facility as required under the applicable laws of the Commonwealth of Pennsylvania. The licensed bed capacity of the Facility is as set forth on Schedule 17(n) attached hereto, the actual bed count operated at the Facility is as set forth on Schedule 17(n) and all such beds are certified for participation in the Medicare and Medicaid reimbursement programs. Except as disclosed in Schedule 17(n), Old Operator has not applied to reduce the number of licensed or certified beds of the Facility or to move or transfer the right to any and all of the licensed or certified beds of the Facility to any other location or to amend or otherwise change the Facility and/or the number of beds approved by DOH (or any subdivision) or other applicable state licensing agency, and except as disclosed in Schedule 17(n), there are no proceedings or actions pending or contemplated to reduce the number of licensed or certified beds of the Facility.

iii. The Health Care Licenses (i) have not been (A) transferred to any location other than the location for which issued or (B) pledged as collateral security or unless such pledge will be released at Closing, (ii) are held free from restrictions or known conflicts that would materially impair the use or operation of the Facility as intended, and (iii) are not provisional, probationary, or restricted in any way.

iv. Except as disclosed in Schedule 17(n), Old Operator has not taken any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care License or applicable provider payment program other than non-material alterations effected in the Ordinary Course of Business.

v. Except as disclosed in Schedule 17(n), Old Operator is in material compliance with the requirements for participation in the Medicare and Medicaid programs with respect to the Facility and Old Operator has a current provider agreement under Title XVIII and/or XIX of the Social Security Act which is in full force and effect. Except as disclosed in Schedule 17(n), during the period of three (3) years prior to Closing Date neither Old Operator nor the Facility has received any of the following with respect to the Facility:

1. A notice of "immediate jeopardy" violations;

2. A notice of termination of the license issued by DOH to operate the Facility for 174 skilled beds;



EXHIBIT A

3. A notice of termination of the certification issued by DOH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

4. A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

5. A notice that the Facility has been placed, or will be placed, on the special focus facilities list;

6. A notice that the Facility will be prohibited from admitting, or will not be reimbursed for, new residents; and

7. A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.

vi. Except as disclosed in Schedule 17(n), neither Old Operator nor the Facility is a target of, participant in, or party to any action, proceeding, suit, audit, investigation or sanction by any Governmental Authority or any other administrative or investigative body or entity or any other third party payor or any resident (including, without limitation, whistleblower suits, or suits brought pursuant to federal or state false claims acts, and Medicaid/Medicare/state fraud/abuse laws, but excluding medical malpractice claims and other civil liability lawsuits for which Old Operator or the Facility is maintaining insurance coverage in the Ordinary Course of Business) which would reasonably be expected to result, directly or indirectly or with the passage of time, in the imposition of a material fine, penalty, alternative, interim or final sanction, a lower rate certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Governmental Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible residents, or any other civil or criminal remedy, or which could reasonably be expected to have a material adverse effect on Old Operator, or the operation of the Facility, including, without limitation, the Facility's ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Old Operator's and the Facility's participation in the Medicare, Medicaid, or third-party payor program, as applicable, or any successor program thereto, at current rate certification, nor to the knowledge of Old Operator has any such action, proceeding, suit, investigation or audit been threatened.

vii. There are no agreements with residents of the Facility or with any other persons or organizations that deviate in any material adverse respect from or that conflict with any statutory or regulatory requirements.

viii. Other than the Medicare and Medicaid programs, neither Old Operator nor the Facility is a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds with respect to the Facility by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291 *et seq.*). Neither Old Operator nor the Facility has received notice of, and there is no violation of, applicable antitrust laws by Old Operator in connection with the Facility.

ix. Old Operator has instituted, and the Facility is operated in material compliance with, a compliance plan which is consistent with best industry practices.

x. Except as disclosed in Schedule 17(n), Old Operator is in material compliance with the Health Care Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act, as incorporated in the American Recovery and Reinvestment Act of 2009, and the regulations promulgated under each.

xi. Except as disclosed in Schedule 17(n), there is no pending or, to Old Operator's knowledge, threatened revocation, suspension, termination, probation, restriction, limitation or non-renewal affecting Old Operator or the Facility or any provider agreement with any third-party payor, Medicare or Medicaid.

xii. All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are materially accurate and complete and are not misleading in any material respects. Except as disclosed in Schedule 17(n), there are no current, pending or outstanding Medicare, Medicaid or other third-party payor program reimbursement audits or appeals pending at the Facility. Except in the normal course of business, there are no cost report years that are subject to audits and no cost reports remain "open" or unsettled. Except in the normal course of business, there are no current or pending Medicare, Medicaid or third-party payor program recoupment efforts at the Facility.

xiii. Except as disclosed in Schedule 17(n), there have been no clawback or overpayment claims made or, to the knowledge of Old Operator, threatened, against Old Operator or with respect to operations at the Facility by Medicare, Medicaid or any third-party payor during the previous three (3) years. Old Operator has provided, or will provide, to New Operator a complete and accurate list of all rate adjustments made by Medicare or Medicaid with respect to Old Operators and the Facility during the previous three (3) years, and shall provide to New Operator an updated list as of the Closing Date.

xiv. Old Operator has delivered, or caused to be delivered, to New Operator true, correct and complete in all material respects resident census information for the Facility's last three (3) fiscal years and current year-to-date broken out by month.

o. Financial Materials. All materials and/or documents relating to the financial condition and/or census of the Facility, provided to New Operator, are true and complete in all material respects, and are not misleading in any material respect.

p. Truth and Accuracy of Representations and Warranties. No representation or warranty by or on behalf of Old Operator contained in this Agreement and no statement by or on behalf of Old Operator in any certificate, list, exhibit or other instrument furnished or to be furnished to New Operator by or on behalf of Old Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

q. Lease. Attached hereto as Exhibit D is a full and complete copy of all documents relating to the Lease. There is no default of Landlord or Tenant under the Lease.

r. Survival of Representations and Warranties. The representations and warranties of Old Operator contained herein shall survive the Closing.

**18. NO JOINT VENTURE**. Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Agreement.

**19. EXHIBITS AND SCHEDULES**. If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. New Operator's obligations to close pursuant to this Agreement shall be conditioned upon New Operator approving all exhibits and schedules within seven (7) days of submission thereof to New Operator. The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date. For the avoidance of doubt, the closing conditions set forth in Section 2(a) and the indemnification provisions of Section 15 shall be read without giving effect to any update to the Schedule or other written notices delivered pursuant to this Section 19.

**20. EVENTS OF DEFAULT; REMEDIES**. Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by either party ("Defaulting Party") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within five (5) Business Days of the earlier of said Defaulting Party's receipt or refusal of written notice of the same from the other party ("Non-Defaulting Party") hereto shall automatically and without further notice hereunder be an immediate event of default ("Event of Default") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder or in law or equity,

including seeking specific performance and/or monetary damages. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief. The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party.

**21. CHOICE OF LAW**. THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

**22. NON-COMPETE**. For a period of two (2) years following the closing, neither Old Operator nor any affiliate of Old Operator shall have any involvement, whether as a member, partner, consultant or otherwise, in the operation of any elder care facility within a radius of twenty five (25) miles of the Facility.

**23. DISPUTE RESOLUTION**. The parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (collectively "Disputes"), the parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute. If after such efforts the parties hereto are unable within ten (10) days of the arising of the Dispute to resolve the Dispute in good faith, then either party may submit to final and binding arbitration before the American Arbitration Association ("AAA"), with an office located in Pennsylvania or its successor, pursuant to the Federal Arbitration Act, 9 U.S.C. Sec. 1 *et seq*. The parties hereto agree that the rules of the AAA applicable to commercial arbitrations shall apply to any such arbitration and that the Expedited Procedures, as defined under the Commercial Arbitration Rules shall apply. Either party may commence the arbitration process called for in this Agreement by filing a written demand for arbitration with AAA, with a copy to the other party. The arbitration will be conducted in Pennsylvania, in accordance with the provisions of AAA Streamlined Arbitration Rules and Procedures in effect at the time of filing of the demand for arbitration. The parties will cooperate with AAA and with one another in selecting an arbitrator from AAA panel of neutrals, and in scheduling the arbitration proceedings. The provisions of this Section 23 with respect to the arbitration before AAA may be enforced by any court of competent jurisdiction. The fees and expenses of such arbitration and the enforcement of any award thereof (including out of pocket costs of investigation, prosecution or defense of any Dispute submitted for arbitration pursuant to this Section 17(a), as applicable, and reasonable attorney fees and expenses, in each case incurred by the prevailing party arising out of, by reason of or in connection with such Dispute, the arbitration thereof or the enforcement of any award of such arbitration) shall be borne by the non-prevailing party, as determined by such arbitration, and the arbitrator shall be empowered to award such fees and expenses to the prevailing party.

Upon the mutual agreement of the parties involved in the Dispute, the parties may submit to final and binding arbitration before any other recognized alternative dispute resolution company or organization. The parties hereto agree that this Section 23 has been included to rapidly and inexpensively resolve any disputes between them with respect to the matters described above, and that this paragraph shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters.

**24. JURISDICTION; VENUE**. EXCEPT AS PROVIDED OTHERWISE IN THIS AGREEMENT, IN THE EVENT ANY DISPUTE BETWEEN THE PARTIES HERETO RESULTS IN LITIGATION, OR TO THE EXTENT A PARTY MUST GO TO A COURT OF LAW TO ENFORCE A JUDGMENT ARRIVED AT THROUGH ARBITRATION PURSUANT TO SECTION 23 OF THIS AGREEMENT, ALL SUCH ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN SHALL BE LITIGATED IN COURTS HAVING SITUS IN THE COMMONWEALTH OF PENNSYLVANIA OR THE U.S. COURT WITH JURISICTION THEREOF. EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID STATE. EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.

**25. DEFINITIONS**. For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

**26. GENERAL PROVISIONS**.

a. Each party hereto agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date. Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder. Each party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

b. All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United

States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by facsimile or e-mail (followed by delivery by one of the other means identified in (i)-(iii)) each addressed as follows:

if to Old Operator:

with a copy to:

if to New Operator:

with a copy to:

Gutnicki LLP
4711 Golf Road, Suite 200
Skokie, Illinois 60076
Attention: Aaron Rokach
Facsimile: (847) 933-9285
Email: arokach@gutnicki.com

Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in, the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; and any such notice delivered via facsimile shall be deemed delivered upon the notifying party's receipt of facsimile confirmation provided that the notifying party follows up such facsimile transmission with one of the other means identified above. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

c. Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

d. This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

e. This Agreement may not be modified or amended except in writing signed by the parties hereto.

f. No waiver of any term, provision or condition of this Agreement, if any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall

be construed as a waiver of any term, provision, condition or rights granted hereunder.

g. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

h. All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

i. This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

j. All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof

k. Each party hereto agrees to use such party's reasonable best efforts to cause the conditions to such party's obligations herein set forth to be satisfied at or prior to the Closing. Each of the parties agrees to execute and/or deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by any other party to assist with consummation of the transactions contemplated herein, or to evidence its rights hereunder.

l. The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made apart hereof as if fully set forth herein.

m. All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "or" "including" shall mean "including without limitation.

n. If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

o. The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

**IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

**OLD OPERATOR:**

RC OPERATOR, LLC

By: [signature]
Name: Joseph Schwartz
Its: Manager

**NEW OPERATOR:**

WT OPERATING, LLC

By: Jonathan Bleier
Name: Jonathan Bleier
Its: Manager

**EXHIBIT A**

# EXHIBIT C

## DEFINITIONS

The terms defined in this Exhibit C, whenever and wherever used in this Agreement (including in all Exhibits and Schedules, unless otherwise defined therein), shall have the respective meanings ascribed to them below for all purposes of this Agreement (each such meaning to be equally applicable to the singular and the plural forms of the respective terms defined). All reference herein to a Section, Exhibit or Schedule are to a Section, Schedule or Exhibit of or to this Agreement, unless otherwise indicated. The words "hereby", "herein", "hereof", "hereunder" and words of similar import refer to this Agreement as a whole (including all Exhibits and Schedules hereto) and not merely to the specific section, paragraph or clause in which such word appears. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise, the word "or" shall not be interpreted as an expression of either state of possibility but shall be construed to mean "and/or." Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

"Accounts Receivable" means all accounts and notes receivables (whether current or non-current) of Old Operator, including trade account receivables outstanding as of the Effective Time and any other rights to receive payment as of the Effective Time in respect of services rendered prior to the Effective Time.

"Action" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, compliant, demand or other legal proceeding (whether based in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person. For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other person is at such time a direct or indirect beneficial holder of at least 25% of any class of equity interests of such specified Person.

"Applicable Law" means, with respect to any Person, any federal, state or local statue, law, ordinance, rule, regulation, writ, Order or other requirement of any Governmental Authority applicable to such Person or any of its Affiliates or any of their respective properties, assets, officers, directors, members, partners or employees (in connection with such officer's, director's member's, partner's or employee's activities on behalf of such person or any of its Affiliates).

"Benefits Plan" means any "employee pension benefit plan" (as defined in Section 3(2) of ERISA, "employee welfare benefit plan (as defined in Section 3(1) of ERISA) and all other bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, equity-based retirement, vacation, severance,

employment agreement, change in control agreement, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) providing benefits to any current or former Employee of Old Operator or with respect to which Old Operator has any Liability to contribute.

"Books and Records" means all books, records and other materials pertaining to the Old Operator or the Business of any and every kind, including lists (e.g., business contacts of Old Operator), programs, correspondence, compact disks, compact disk lists, ledgers, files, reports, plans, drawings and operating records of every kind, held or maintained by Old Operator or any of Affiliate of Old Operator, disk or tape files, printouts, runs or other computer-prepared information pertaining to the Acquired Assets or the Business.

"Business" means the business conducted by Old Opeartor and proposed to be conducted by Old Operator as of the Effective Date.

"Business Day" means any day other than a Saturday, Sunday or a weekday on which banks in Illinois, New York or Pennsylvania are authorized or required to be closed.

"CMS" means the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"DOH" means the Pennsylvania Department of Health.

"Environmental Laws" means all federal, state and local statutes, regulations, ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, pollution or protect of the environment, including all those relating to the presence, use, production, generation, handling, transportation, storage, disposal, distribution, labeling, testing, processing, discharging, release, threatened release, control or cleanup of any Hazardous Substances, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6921, *et seq.*) and regulations adopted thereunder.

"Existing Contracts" means all of Old Operator's contracts, leases, subleases, licenses, Permits, purchase and sale orders and any other agreement, commitments or binding arrangements or understandings, whether written or oral, to which Old Operator is a party, including each amendment, modification, renewal or extension or other ancillary document pertaining thereto.

"Governmental Authority" means any federal, state local or municipal government or any subdivision thereof, any regulatory or administrative authority, or any agency or commission or any court, tribunal or judicial or arbitral body.

"has provided," "made available" and similar formulation means such information in question that was delivered or provided by Old Operator or its Representatives to New Operator by way of online file sharing, cloud file sharing, email attachments, written correspondences, compact disks, disk or tape files, printouts, compressed file containers or other electronic or physical delivery means.

"Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes regulated under any Environmental Laws.

"Indebtedness" means, with respect to any Person, and without duplication, (i) any indebtedness or other obligation for borrowed money; (ii) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business; (iii) the face amount of all letters of credit issued for the account of such Person; (iv) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens; (v) capitalized lease obligations; (vi) unfunded obligations for pension, retirement, severance benefits for any officer, director or employee of such Person; (vii) unfunded obligations for deferred compensation for any officer, director or employee of such Person; (viii) all guarantees and similar obligations of such Person; (ix) all bankers acceptances and overdrafts; (x) all interest, prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness; (xi) under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) issued or assumed as the deferred purchase price of property or services (other than trade accounts payable or accounts payable to independent contractors), and (xiii) for all accrued interest on, and arising from any breach of, any of the foregoing.

"Liability" means any liability, obligation, claim, Indebtedness, penalty, cost or expenses (including costs of investigation, collection, defense, and environmental remediation or investigation), deficiency, guaranty or endorsement of or by any Person of any type, secured or unsecured, whether accrued, fixed, absolute, or contingent, asserted or unasserted, due or to become due, whether or however arising (including contract, tort, negligence or strict liability), liquidated or unliquidated, known or unknown and whether or not current or long term.

"Lien" means any claim, lien (statutory or otherwise), encumbrance, pledge, Liability, restriction, charge, instrument, license, preference, priority, security agreement, covenant, right of recovery, option, charge, hypothecation, easement, security interest, interest, right of way, encroachment, mortgage, deed of trust, imperfection of title, prior assignments, Tax (including federal, state and local Tax), Order or other encumbrance or charge of any kind or nature whatsoever including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing; (ii) any assignment or deposit arrangement in the nature of a security device; and (iii) any leasehold interest, license or other right, in favor of a Third Party or Old Operator, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled,

noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Loss" means, in respect of an indemnifying party's indemnification obligations, all direct and indirect Liabilities, judgments, claims, suits, proceedings, settlements, losses, damages, fees, Liens, Taxes, penalties, interest obligations, expenses (including out of pocket costs of investigation and defense and reasonable attorney fees and expenses), and any diminution in value of the Facility resulting therefrom that are or have been incurred or suffered by an indemnified party.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business of Old Operator consistent with past custom and practice.

"Other Documents" means Bill of Sale, General Assignment, Old Operator Disclosure Schedule, New Lease and any certificates, instruments, agreements and other documents contemplated under this Agreement.

"Permits" means all municipal, state, federal and local consents, Orders, filings, franchises, permits, approvals, certificates, licenses, agreements, waivers, and authorizations issued by, or otherwise granted by, any Governmental Authority that are held by, or used in connection with, or required for, the Business or the Acquired Assets (including all modifications thereto or renewals thereof).

"Person" means any person, firm, corporation, partnership, joint venture, limited liability company, association or other entity (governmental or private).

"Regulatory Approval" means any consent, approval, authorization, waiver, permission, concession, agreement, license, exemption or Order of, or declaration of any Governmental Authority.

"Representative" means, with respect to any Peron, any of its attorneys, accountants, agents, consultants or other representatives.

"OIG" means the United States Department of Health and Human Services, Office of Inspector General.

"Old Operator Disclosure Schedules" means the schedules of exceptions to the representations and warranties of Old Operator in this Agreement (which shall be delivered to New Operator by Old Operator prior to the execution and delivery of this Agreement by the parties hereto).

"Old Operator's Knowledge," "Knowledge of Old Operator" and similar formulations means the actual knowledge of any director, managing member, managing partner, officer or employee of Old Operator with respect to the relevant fact or other matters at issue or should

have had actual knowledge of such relevant fact or other matter assuming the diligent exercise of such individual's duties as a director, managing member, managing partner, officer or employee of Old Operator, and after reasonable investigation of all employees of Old Operator or any Affiliate thereof reasonably expected to have actual knowledge of such fact or matter.

"Organizational Documents" means certificate of incorporation, articles of incorporation, charter, bylaws, articles of formation, certificate of formation, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates adopted or filed in connection with the creation, formation or organization of a Person, including any amendments, restatements and supplements thereto.

"Tax" and, with correlative meaning, "Taxes" means with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not; (ii) liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person; or (iii) liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any affiliated group as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Old Operator relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Old Operator, New Operator or any of their respective Affiliates.

"Transaction Expenses" shall mean (i) the aggregate attorneys', accountants' and brokers' fees and expenses incurred or to be incurred by Old Operator that remain unpaid as of the Effective Time, (ii) the amount of real estate transfer tax imposed by Applicable Law and consistent with payment customs of the location in which the relevant real estate property is located in connection with the transactions contemplated by this Agreement, (iii) payment of all special and betterment assessments, water rates and sewer charges, in each case on a prorated basis and adjusted as of the Effective Time, (iv) Old Operator's Employment Expenses_and (v) all other fees and expenses relating to the transfer of Property in accordance with this Agreement (including, without limitation, cost of recording, preparing the Deed and applicable brokerage

commissions), in each case of (i), (ii), (iii) and (iv), to the extent not paid in full prior to or at the Closing.

"Transferred Assets" means collectively, the Website Materials, telephone number of Old Operator, the Employee Records, the Books and Records of the Facility, the Personal Property, the Resident Agreements and the Assumed Contracts.

"WARN Act" means the Worker Adjustment and Retaining Notification Act of 1988, as amended.

The following terms used in this Agreement shall have the meanings set forth in the corresponding Paragraphs, subparagraph, Sections or subsections of this Agreement:

| Defined Term | Section |
|---|---|
| "Agreement" | Recitals |
| "Effective Date" | Recitals |
| "Old Operator" | Recitals |
| "New Operator" | Recitals |
| "Seller" | Recitals |
| "Facility" | Recitals |
| "Personal Property" | Recitals |
| "Property" | Recitals |
| "Old Lease" | Recitals |
| "New Lease" | Recitals |
| "Closing' | Section 1 |
| "Effective Time" | Section 1 |
| "Bill of Sale" | Section 2 |
| "General Assignment" | Section 2 |
| "CMP" | Section 2 |
| "Penalty" | Section 2 |
| "Recapture" | Section 2 |

| | |
|---|---|
| "Waiving Party" | Section 2 |
| "Excluded Liabilities" | Section 3 |
| "Excluded Assets" | Section 3 |
| "Personal Property" | Section 4 |
| "Patient Trust Funds and Property" | Section 5 |
| "Recapture Claim" | Section 6 |
| "Assumed Contract" | Section 7 |
| "Rejected Contract" | Section 7 |
| "Resident Agreement" | Section 7 |
| "Current Employee" | Section 8 |
| "Old Operator's Employment Expenses" | Section 8 |
| "Employee Records" | Section 10 |
| "Website Materials" | Section 12 |
| "Provider Agreements" | Section 13 |
| "New Operator's Indemnitees" | Section 15 |
| "Old Operator's Indemnitees" | Section 15 |
| "Indemnitee" | Section 15 |
| "Indemnitee's Claim" | Section 15 |
| "Indemnitor" | Section 15 |
| "Indemnification Default" | Section 15 |
| "Health Care Licenses" | Section 17 |
| "Defaulting Party" | Section 20 |
| "Non-Defaulting Party" | Section 20 |
| "Event of Default" | Section 20 |

| | |
|---|---|
| "Disputes" | Section 23 |
| "AAA" | Section 23 |

NIQA 19-3964

JS 44 (Rev 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)

**I. (a) PLAINTIFFS**

RC Operator, LLC

**(b)** County of Residence of First Listed Plaintiff Kings County, NY
*(EXCEPT IN U S PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name Address and Telephone Number)*
Michael Schafle
Green & Schafle, LLC
100 South Broad St, Ste 1218, Philadelphia, PA 19110

**DEFENDANTS** 19 3964

WT Operating, LLC
Jonathan Bleier

County of Residence of First Listed Defendant Ocean County, NJ
*(IN U S PLAINTIFF CASES ONLY)*

NOTE IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U S Government Plaintiff
- ☐ 3 Federal Question *(U S Government Not a Party)*
- ☐ 2 U S Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for Nature of Suit Code Descriptions

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran s Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer w/Disabilities - Employment
- ☐ 446 Amer w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U S Plaintiff or Defendant)
- ☐ 871 IRS Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U S Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***
28 U S C 1332

Brief description of cause
breach of contract

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P

**DEMAND $** 3,100,000 00

CHECK YES only if demanded in complaint
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)* JUDGE DOCKET NUMBER

AUG 30 2019

DATE
08/29/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows.

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title

**(b)** **County of Residence.** For each civil case filed, except U S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved )

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)"

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below

United States plaintiff. (1) Jurisdiction based on 28 U S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U S is a party, the U S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship (4) This refers to suits under 28 U.S C 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U S.C., Section 1441 When the petition for removal is granted, check this box.

Remanded from Appellate Court (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District (5) For cases transferred under Title 28 U S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation Transfer (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U S.C. Section 1407.

Multidistrict Litigation – Direct File (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.

**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U S Civil Statute. 47 USC 553 Brief Description Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action Place an "X" in this box if you are filing a class action under Rule 23, F.R Cv.P

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

NIQA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

19 3964

DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 1859 54th Street, Brooklyn, New York 11204

Address of Defendant: 1470 Parkside Drive, Lakewood, New Jersey 08701

Place of Accident, Incident or Transaction: PA

***RELATED CASE, IF ANY:***

Case Number: ______ Judge ______ Date Terminated ______

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1 Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? Yes ☐ No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? Yes ☐ No ☑

3 Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? Yes ☐ No ☑

4 Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? Yes ☐ No ☑

I certify that, to my knowledge, the within case ☐ is / ☒ **is not** related to any case now pending or within one year previously terminated action in this court except as noted above

DATE 08/29/2019 ______ Must sign here ______ 93060 (PA)

*Attorney-at-Law / Pro Se Plaintiff* *Attorney I D # (if applicable)*

**CIVIL: (Place a √ in one category only)**

***A. Federal Question Cases:***

- ☐ 1 Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2 FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7 Civil Rights
- ☐ 8 Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11 All other Federal Question Cases *(Please specify)* ______

***B. Diversity Jurisdiction Cases:***

- ☑ 1 Insurance Contract and Other Contracts
- ☐ 2 Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4 Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6 Other Personal Injury *(Please specify)* ______
- ☐ 7 Products Liability
- ☐ 8. Products Liability -- Asbestos
- ☐ 9. All other Diversity Cases *(Please specify)* ______

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration )*

I, Adam Green, counsel of record *or* pro se plaintiff, do hereby certify

☑ Pursuant to Local Civil Rule 53 2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought

AUG 30 2019

DATE 08/29/2019 ______ Sign here if applicable ______ 93060 (PA)

*Attorney-at-Law / Pro Se Plaintiff* *Attorney I D # (if applicable)*

NOTE A trial de novo will be a trial by jury only if there has been compliance with F R C P 38

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| RC OPERATOR, LLC | : | CIVIL ACTION |
| v. | : | |
| JOHNATHAN BLEIER and WT OPERATING, LLC | : | NO. 19 3964 |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) (F)

(f) Standard Management -- Cases that do not fall into any one of the other tracks. (X)

| 8/29/19 | Adam M. Green | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-462-3330 | 215-567-1941 | agreen@greenlegalteam.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

AUG 30 2019

NIQA

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a) The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b) In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c) The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d) Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e) Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.